Filed 5/14/14  In re N.M. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re N.M. et al., Persons Coming Under the Juvenile Court Law. | B248376 (Los Angeles County Super. Ct. No. CK76837) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.M.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Amy M. Pellman and D. Zeke Zeidler, Judges, and Albert Garcia, Referee.  Affirmed in part and reversed in part.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] J.M., the legal guardian of minors N.M. and A.L., challenges the juvenile court's jurisdictional findings and removal order on grounds of insufficiency of the evidence. We reverse one of two jurisdictional findings and otherwise affirm.

## BACKGROUND

In April 2007, a probate court appointed J.M. the legal guardian of her one-year-old granddaughter, N.M. In November 2010, the probate court appointed J.M. the legal guardian of her nearly six-month-old granddaughter, A.L. N.M. and A.L. are half sisters. Their mother, L.M., is J.M.'s daughter.

In April 2011, L.M. gave birth to daughter E.R. Later that month the Los Angeles County Department of Children and Family Services (DCFS) filed a dependency petition regarding E.R. On April 18, 2011, the juvenile court placed E.R. with J.M. (and her half sisters N.M. and A.L.).

After attempting to provide resources and referrals to J.M. for more than six months, as described more fully below, on December 21, 2011, DCFS filed the dependency petition at issue here involving N.M. and A.L. The allegations under section 300, subdivision (b), that were later sustained by the juvenile court are as follows: "The children N[.]M[.] and A[.]L[.]'s Legal Guardian, Maternal Grandmother, J[.][M[.], has mental and emotional problems, including a diagnosis of Bi-polar [sic] Disorder, which renders the Legal Guardian unable to provide regular care and supervision of the children. The Legal Guardian failed to take the Legal Guardian's psychotropic medication as prescribed. Such mental and emotional condition on the part of the Legal Guardian endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of physical harm and damage" (count b-1); and "The children N[.]M[.] and A[.]L[.]'s Legal Guardian, Maternal Grandmother, J[.]M[.], is unable to obtain ASFA [Adoption and Safe Families Act] approval, due to the

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Legal Guardian's failure to provide suitable, stable housing for the children. The Legal Guardian's inability to provide stable housing for the children, and the Legal Guardian's failure to obtain ASFA approval, endangers the children's physical health and safety, and places the children at risk of physical harm, damage and danger" (count b-3).

On appeal, J.M. challenges the sufficiency of the evidence supporting both jurisdictional findings regarding her care of N.M. and A.L. DCFS concedes that count b-3, the allegation regarding J.M.'s inability to meet requirements under ASFA for placement of E.R., is not a proper basis for jurisdiction as to N.M. and A.L. in this case. Accordingly, we review the evidence supporting the juvenile court's finding regarding J.M.'s mental and emotional problems.

**Detention**[2]

At the time DCFS placed newborn E.R. with J.M. in April 2011, the children's social worker told 50-year-old J.M. that the three children could not reside with her in the unheated garage of her parents' home in Baldwin Park. The garage "did not have adequate beds for the infants [E.R. and A.L.] to sleep in." J.M. agreed that she and the children would live inside her parents' home. Later, J.M. admitted that she and the children had been staying in the garage, explaining, "[my parents] 'don't like me.'" J.M.'s parents, who had adopted her, were in their eighties and had health problems. J.M.'s father, the children's maternal great-grandfather, "felt that J[.M.] was overwhelmed in trying to provide for two grand [sic] children and they [the great-grandparents] [we]re not in agreement with her bringing another infant [E.R.] into the home." The great-grandparents refused to submit to live scan fingerprinting, an ASFA requirement, and refused to accept a delivery to their home of children's bedroom furniture which was paid for with funds accessed by DCFS.

The social worker made "repeated" inquiries regarding J.M.'s mental health. At the end of June 2011, the social worker received a written response from the psychiatrist

---

[2] Facts in this section are taken from DCFS's December 21, 2011 Detention Report unless otherwise indicated.

who had been treating J.M. for the past five years. The June 23, 2011 letter, attached to the Detention Report, states: "[J.M.'s] diagnosis is Bipolar I Disorder, Last Episode Manic. She recently reported more depressive symptoms. Her medications consist of: Cymbalta 120mg/day, Topamax 100 mg/day, and Klonipin .5mg/day. Ms. J[.M.] is currently receiving medication services and case management with our clinic and demonstrates consistency with service compliance. Ms. M[.] reports progress in treatment and displays motivation for continued treatment."

On July 9, 2011, the social worker learned that J.M. had moved out of her parents' garage and "was renting apartment space" in Baldwin Park. On August 9, 2011, the woman from whom J.M. was renting called the social worker and stated: "'I want her out of my home, she is threatening my life, my home. I have made a police report, I want her out today. I was just trying to help her because of the babies she is caring for. She refused to even give me her last name[.] I just wrote down her tag number.'"

In early August 2011, J.M. informed the social worker she had moved out of the apartment in Baldwin Park and was living with the children in a motel in Covina. The social worker visited the motel to assess the safety of the residence for three-month-old E.R., who had been placed with J.M. under the jurisdiction of the juvenile court. J.M. told the social worker she was having E.R. sleep in a car seat until she could move a bed into the motel room. The social worker "advised against the infant sleeping in a car seat and asked [J.M.] to correct this issue immediately."

On August 9, 2011, J.M. participated in a team decision making meeting (TDM) with DCFS staff and representatives of other agencies, including the Los Angeles County Department of Social Services (DPSS) and Department of Mental Health, to discuss services that could be provided for her. The representative from DPSS offered J.M. "homeless assistance funding in the estimated amount of $2500.00." J.M. "refused the offer . . . stating that DCFS was tricking her into taking her children." She also stated that if housing were found for her in certain "bad" areas, she might not want to live there. J.M. also refused assistance with an appeal of the denial of Social Security benefits. On

4

August 15, 2011, she declined to accept DCFS's offer to pay for daycare for the children, stating, she "'did not trust anyone around her children.'"

On August 18, 2011, J.M. moved out of the motel and into a home in Baldwin Park. On September 9, 2011, the social worker made an unannounced visit to the home to check on the welfare of E.R. "The home was neat and clean and the family was in the process of completing the move-in." The social worker observed E.R. and A.L., who were napping, and found them to be dressed, well groomed and free of visible marks or bruises. J.M. informed the social worker that "she was being evicted and had to move by 9/15/11 as she was having problems with the landlord." J.M. explained that "she was watering the front yard and the house flooded and the landlord accused her of causing the problem. The landlord came into the residence and moved the refrigerator into the kitchen area and [J.M.] stated she wanted the refrigerator in [the] dining room area."

The same day, the social worker walked to an adjacent house and spoke with the landlord, who confirmed she was evicting J.M. effective September 15, 2011. The landlord stated that J.M. had flooded the home and installed an air conditioner in "an unprofessional" manner, necessitating $5,000 in repairs. The landlord also complained about J.M. wanting "to place the refrigerator in the dining room and not in the kitchen." The landlord further asserted that J.M. "exhibited behavior that was not normal," including screaming and cursing at and threatening the landlord. On one occasion, J.M. became upset and threatened the landlord when the landlord touched E.R.

In mid-September, in E.R.'s dependency case, DCFS recommended that a permanent placement be found for E.R. because DCFS was not recommending permanency with J.M. due to J.M.'s mental health issues and "various issues regarding her lack of care and neglect for" E.R. DCFS also reported in E.R.'s case that it would consider detention for N.M. and A.L., "[i]f necessary" for their safety.

The social worker in N.M. and A.L.'s case made repeated calls to J.M. to try to determine where the family was living. On October 6, 2011, J.M. informed DCFS that she and the children were again living at the motel in Covina. When the social worker visited her there, J.M. told him "that someone stole her wallet with $500.00 inside." The

social worker "reminded her that," a few days after DCFS placed E.R. in her care in April 2011, she made the same claim that someone had stolen her wallet with $500 inside. Shortly after this visit, J.M. and the children moved back to her parents' home.

On November 23, 2011, J.M. participated in another TDM with DCFS staff and a representative from DPSS. J.M. continued to refuse the offers of homeless assistance funding and help with her Social Security benefits appeal because "she does not trust DCFS" and believed "DCFS was tricking her into taking her children."

DCFS interviewed the children's mother, L.M. (J.M.'s daughter), on December 5, 2011. She told the social worker she wanted her daughters, E.R., A.L. and N.M., to remain with J.M. L.M. was transient and told the social worker she could not provide DCFS with a current address or telephone number.

DCFS interviewed J.M.'s parents (the maternal great-grandparents) on December 7, 2011. The great-grandmother explained that, three years before, when the great-grandparents were out of town, J.M. entered their home and moved in with N.M. without their permission. According to the great-grandmother, J.M. "was going through separation anxiety." The great-grandmother also stated: "Sure we are afraid for our lives; I have a friend that is a Lt[.] on the police force in Baldwin Park. My daughter J[.M.] knows if I call the police they will be her[e] really fast. They are looking out for my husband and me. We have asked her to get her own place. . . ."

DCFS interviewed J.M. on December 16, 2011. J.M. stated: "'My parents don't like me. They never do anything to help me, this is my house also. They are going to die soon and I will get the house anyway. I just want to adopt E[.R.] and get [] payments. I don't trust anyone with my children but me[.] [T]hey are my stabilizing factor. I need to have those kids. My father should agree to live scan but he hates me[.] [H]e has never liked me[.] [A]ll of this is his fault."

On December 16, 2011, while J.M. and the children were at a DCFS office, a DCFS nurse assessed the children's health. When the nurse changed E.R.'s diaper, she noted that E.R. "suffered from a severe diaper rash where blood was discharged." The nurse observed "dried fecal matter" in A.L.'s diaper and found that A.L. also had a diaper

6

rash. DCFS detained the children from J.M. that day because of the diaper rashes, lack of suitable housing and J.M.'s mental health issues. DCFS placed the children with maternal aunt T.M. (J.M.'s daughter). T.M. was in the process of adopting the children's half brother, I.K. (L.M.'s son, J.M.'s grandson).

On December 21, 2011, DCFS filed the dependency petition regarding N.M. and A.L., setting forth the allegations quoted above regarding J.M.'s mental health issues (count b-1), and inability to obtain ASFA approval for E.R.'s placement (count b-3). The petition also included an allegation regarding medical neglect based on E.R.'s diaper rash (counts b-2 & j-1). The same day, the juvenile court ordered N.M. and A.L. detained from J.M. and granted J.M. reunification services and monitored visitation.

## Jurisdiction[3]

On January 10, 2012, a dependency investigator interviewed J.M. at a DCFS office. J.M. denied the allegations of medical neglect based on the diaper rash the DCFS nurse reported seeing on December 16, 2011. J.M. told the investigator, "'I love these children. They ground me. They're my life. I would never hurt them.'" J.M. showed the investigator medical records indicating the children were examined by their regular health care provider on December 13 and 15, 2011, and the children were found to be in good health with no evidence of medical neglect.

Five-year-old N.M. told the investigator J.M. took good care of her. N.M. called J.M. "'mom'" even though J.M. is her grandmother. N.M. wanted to live with J.M. The children's mother (L.M.), J.M.'s other daughter (T.M.), and the great-grandmother all denied that they had seen J.M. medically or physically neglect the children. The great-grandmother explained that J.M. "was always protective of the children" and "fed and bathed them as well as she could depending on her living circumstances."

The dependency investigator conceded that, other than the one "isolated incident" of diaper rash, "there does not appear to be evidence of medical neglect." DCFS

---

[3] Facts in this section are taken from DCFS's February 14, 2012 Jurisdiction/Disposition Report unless otherwise indicated.

recommended the allegations in the petition regarding medical neglect based on the diaper rash be dismissed (counts b-2 & j-1).

Regarding her mental health history, J.M. told the dependency investigator she had anxiety and depression. When the investigator asked if she had Bipolar Disorder, J.M. stated that she and her psychiatrist "'agreed to disagree on that.'" J.M. indicated she knew better than her psychiatrist what mental disorder she had, stating, "'Because I know myself better.'" Mother asserted she "'always took [her prescribed medication] faithfully every day,'" although she was aware a case worker at the clinic reported that she had not been compliant with her medication. J.M. stated that the case worker was new there and did not know her and she "'changed case workers because she [the case worker] wasn't doing [her] right.'" J.M. did not currently have a therapist because the case worker used to be her therapist and the case worker "'just wasn't working for [her].'"

J.M. denied her unstable living circumstances were evidence of mental instability. She blamed her parents for refusing to help her, her former landlord for evicting her when the flood was caused by faulty plumbing, and DCFS staff for being "'against' her," "untruthful," and "unfair to her." J.M. stated she could not get a job because she was "on disability and thus had no financial resources."

J.M.'s daughter, T.M., told the investigator she was aware that J.M. recently had stopped taking her medication for depression and anxiety. T.M. stated that J.M. "was overly emotional, volatile and unpredictable and that she often became agitated and would alienate other people." After growing up with J.M. and experiencing her emotional "drama," T.M. emphatically stated she would not leave her own children unsupervised with J.M.

The dependency investigator reported that she made her own observations on January 10, 2012 regarding J.M.'s mental health issues. When J.M. saw the children, she "swept A[.L.] into her arms and gave her a nearly crushing embrace, then stood shaking and sobbing and clinging on to the child. The grandmother [J.M.] was so focused on clinging on the child while sobbing that she did not even notice that her behavior was making older sibling N[.M.] anxious. N[.M.] was standing in front of the grandmother,

8

also wanting to greet the grandmother. However, the grandmother was almost in what could be described as a 'trance-like' state, wherein she was hugging A[.L.], turning from side to side with her (kind of like a rocking or cradling motion) and sobbing out loud, making a kind of moaning sound. The D.I. [dependency investigator] had to intervene and point out [to] the grandmother that N[.M.] was waiting to be greeted. The D.I. also told the grandmother that such excessively needy and emotional behavior was not appropriate and was upsetting to the children. The grandmother ignored the D.I."

The dependency investigator also wrote about J.M.'s reluctance to allow the investigator to photocopy the children's medical records that J.M. brought with her to the DCFS office that day. The investigator reported: "The grandmother [J.M.] said that she did not trust the documents with anybody, particularly DCFS and that she believed that DCFS might take the documents from her and never give them back, and that they were the grandmother's 'only protection' against DCFS lies. [¶] The D.I. assured the grandmother that she was only going to go around the corner to the copy machine, make copies and come right back with them. Even then the grandmother was reluctant to hand the documents over to the D.I., but she finally agreed to do so." Two pages were missing from the medical records relating to N.M. J.M. accused the investigator of taking them when she photocopied them. The investigator stated she was certain the pages were missing when J.M. handed them to her. J.M. continued to insist that the investigator had taken the documents and later complained about it to the social worker.

On January 11, 2011, N.M. and A.L. were moved from their placement with T.M. (J.M.'s daughter) to the home of non-related extended family member, Ilma V. T.M. and her husband had their hands full trying to balance their work, the pending adoption of the children's half sibling I.K., and their own biological children. Ilma is T.M.'s husband's cousin. Infant half sister E.R. was moved to a different placement.

On January 20, 2011, the dependency investigator interviewed Erlinda P., the woman from whom J.M. rented a room in July 2011. Erlinda described the two-week period during which J.M. lived with her as "very unpleasant. Very, very unpleasant." Erlinda stated that J.M. had been "driving [her] crazy." The investigator asked her to

explain, and Erlinda stated: "'She would stay up all night with those kids. She was just up all night and she would be talking and talking to the kids. She babbled a lot. I'm sure they would have preferred to sleep. She was constantly talking.'" While talking to the children at night, J.M. would use profanity ("'the F word" and "'shit'") and tell them "their mother was a 'bitch.'" The children's mother, L.M., would "'be out all night and sleep all day.'" Erlinda was aware that L.M. was not supposed to be at the home with the children.

The dependency investigator asked Erlinda about J.M.'s demeanor. Erlinda responded: "'The first thing I noticed about her, is she seemed to have problems composing herself. She was saying she needed help [with a place to live]. She seemed to shake a lot and was sweaty. Supposedly she was on medication.'" J.M. and L.M. told Erlinda "'[J.M.] was on Prozac or something.'" When Erlinda asked J.M. to move out, J.M. "threatened her, saying, 'I had a green light put out on you' (which is gang-type parlance for a contract for someone to be harmed." Erlinda called the police and officers came and took a report.

The dependency investigator reported that J.M.'s ex-husband was currently "helping her rent an apartment and to stabilize her life." J.M. told the investigator she needed to have the children in her custody "to stabilize" her. The investigator described J.M.'s relationship with the children as being "fraught with emotional liability."

Attached to a February 14, 2012 last minute information for the court, DCFS submitted a February 6, 2012 letter from the clinic where J.M. received her mental health services. The letter states: "According to Dr. Pinson, Ms. M[.] has a Mood Disorder along with general anxiety and panic. She has missed two out of eight appointments. One of the missed appointments was due to a clinical misunderstanding, and it was not Ms. M[.]'s intention to miss said appointment. Ms. M[.]'s psychiatrists have utilized various medications, and Ms. M[.] has experienced severe side effects; furthermore, Ms. M[.] and psychiatrists have worked together to stop medication when negative side effects occur. Ms. M[.] has been responsible and consistent with current medication regime. Although it is out of our scope of practice to discuss Ms. M[.]'s ability to

properly care for and supervise children, it can be stated that when Ms. M[.] presents herself to appointments with her grandchildren, she is appropriate in her care for them. Moreover, the children appear clean, playful, and without anxiety. Ms. M[.] has been surprisingly calm in the midst of her current situation, whereas in the past, Ms. M[.] has been shown to get overcome by her anxiety."

Also attached to the February 14, 2012 last minute information for the court is a Multidisciplinary Assessment Team Summary of Findings Report (MAT Report) discussing J.M.'s, N.M.'s and A.L.'s situations. The MAT Report states that J.M. moved into a studio apartment in Monrovia on December 31, 2011. She had applied for affordable housing through the Department of Housing and Urban Development, and expected to move into a three-bedroom condominium in Covina in August 2012. She was still unemployed. DCFS described J.M. as "forthcoming with providing information regarding her mental health history." J.M. stated her case manager at the clinic would be helping her enroll in individual therapy. She had participated in parenting classes in the past and was open to taking parenting classes again. J.M. stated she had not been having visits with the children as ordered by the juvenile court because the social worker had not responded to her attempts to contact him.

As set forth in the MAT Report, N.M. and A.L. remained placed with Ilma V. Five-year-old N.M. attended elementary school and after school daycare. One-year old A.L. attended the same daycare as N.M. When N.M. was living with J.M., she attended preschool inconsistently. "[B]ased on grandmother's state of mind, the child would be taken to school or she would be taken out for long periods of time." Ilma reported that N.M. "appear[ed] to be overprotective of" A.L. and tried to take care of her. N.M. would ask to lie down next to A.L. so N.M. could "rest well and not worry about A[.L.]'s well being." Ilma also reported that N.M. discussed "family information not suitable for a 5 year old." According to Ilma, N.M. would say, "'the bad guy [the social worker] took me away from mom [J.M.].'" N.M. also discussed the fact that she and A.L. had different fathers, that N.M.'s father was in jail, and that J.M. had given her a rosary to carry around

11

so that N.M. would not forget J.M.  The MAT assessor reported that N.M. "needs to trust that caregivers will take care of her and that her place of living won't change."

At the pretrial resolution conference on February 14, 2012, the juvenile court ordered DCFS to interview J.M.'s psychiatrist, Dr. Pinson, and provide a report to the court.  In a March 5, 2012 last minute information for the court, DCFS reported that the social worker had tried to contact Dr. Pinson by telephone twice in February, but had not received a return call.  On February 27, 2012, the social worker spoke with a case manager at the clinic who reported that J.M. was not enrolled in therapy at the clinic but was enrolled in a parenting class to start the following week.  The last minute information also discusses a February 28, 2012 TDM with J.M. during which J.M. informed DCFS she had a residence but did not have furniture, a stove or a refrigerator.

DCFS submitted a second last minute information for the court later in the day on March 5, 2012.  In that report, DCFS stated the social worker had visited J.M.'s studio apartment on February 29, 2012 and found a lack of "adequate beds for the children to sleep on or a stove."  DCFS also reported that it made a plan for J.M. to have three, three-hour monitored visits with N.M. and A.L. per week.  DCFS also included in the report the contents of a letter received from caregiver Ilma V.

In the letter, Ilma stated that she and her husband wanted to adopt N.M. and A.L.  Ilma continued to express shock at the comments five-year-old N.M. made to her.  N.M. told her J.M. was often tired while taking care of her, especially when J.M. "'had to take her Cymbalta.'"  N.M. stated the garage at her great-grandparents' home did not have water so she only bathed "once in a while" when she "'could sneak into" the great-grandparents' home when they were not home.  N.M. reported that the first time she ever used a toothbrush was when she went to live with T.M. in December 2011.  N.M. also told J.M., "'I lived in so many motel rooms, I don't remember them all[.]'"  N.M. expressed to Ilma that she wanted to remain in Ilma's home.

On March 5, 2012, the parties participated in a mediation but the jurisdictional/dispositional issues were not resolved.

In an April 2, 2012 last minute information for the court, DCFS reported that it had to terminate J.M.'s visits with N.M. and A.L. after 10 minutes on January 10, February 28 and March 9, 2012, due to her behavior. During each visit, J.M. held the children so tightly that they "turn[ed] red in the face," she accused DCFS of stealing the children from her and she called her lawyer. On January 10, she repeatedly accused her daughter T.M. "of being against her and trying to steal the children from her." She became agitated and angry that day and, instead of visiting with the children, she "ma[de] threats [that] no one will get custody of her children." Due to her threats, DCFS staff asked her to leave the office. She would not agree to leave until staff notified her that they were going to call the police.

During the March 9, 2012 visit, J.M. told N.M. and A.L. "not to listen to the caretakers or follow any instructions given." Her daughter, L.M., unsuccessfully tried to calm her down. DCFS terminated the visit after 10 minutes and L.M. called the police to complain. The police did not respond. J.M. and L.M. went out to the parking lot and wrote down the license plate number of Ilma V.'s car. "Due to this erratic behavior the children were secured in another area of the DCFS office." Two social workers and a DCFS security officer "secured the caretaker['s] automobile and drove it to the rear of the building to ensure the minors and caretaker coul[d] leave safely."

Attached to the April 2, 2012 last minute information for the court, DCFS submitted a March 9, 2012 letter from Ilma V. to the social worker describing the visit that day. Ilma explained that N.M. was "giggly, chatty and happy" when Ilma picked her up from school. But when N.M. "saw her grandmother [J.M.] and mother [L.M.], her entire demeanor changed. It was as if she had seen a ghost." N.M. "plead[ed] with tears in her eyes, that all she wanted was to go with Ilma."

At a hearing on April 2, 2012, the juvenile court ordered DCFS to have a TDM to address visitation. On May 15, 2012, DCFS sent a visitation plan to J.M., providing for two, two-hour visits per week with N.M. and A.L. at a DCFS office. On June 7, 2012, the court ordered DCFS to investigate L.M.'s claim that A.L. had a severe diaper rash on her vagina on May 16, 2012.

13

In an August 2, 2012 interim review report, DCFS discussed J.M. and L.M.'s May 16, 2012 visit with two-year-old A.L. On that day, six-year-old N.M. refused to visit, stating she "'did not want to see or talk to her mother L[.]M[.] or her [grandmother] J[.]M[.].'" Again J.M. held A.L. so tightly during the visit that A.L.'s face turned red. The social worker asked J.M. to relax her arms. J.M. sat on a sofa in the visiting area and asked L.M. to stand in front of her. The social worker told them that they could not block his view of A.L. during the visit. When they did not comply with his request to move so he could see A.L., the social worker moved the visit to the lobby area of the DCFS office. J.M. "continued to order" L.M. to stand in front of her. The social worker believed that J.M. "was attempting to tamper with or put something in [A.L.]'s diaper," but the social worker made sure he could always see A.L. About 10 minutes later, L.M. told DCFS staff that A.L.'s diaper needed to be changed. An intern took A.L. to the bathroom and changed her diaper. Thereafter, L.M. and J.M. told the social worker that A.L. "had a severe diaper rash and bruises on her legs and buttock area" and they "had taken photos to prove it." A public health nurse was called in to examine A.L. and the nurse did not observe a rash or any bruises on A.L. J.M. and L.M.'s allegations that one-year-old E.R. had a severe diaper rash during a visit in June 2012 were also determined to be unfounded.

Attached to the August 2, 2012 interim review report, DCFS submitted a May 23, 2012 affidavit and letter from J.M.'s daughter T.M., stating reasons she did not believe the juvenile court should allow J.M. to reunify with N.M. and A.L. T.M. stated that she had seen J.M. "be emotionally and mentally abusive" to the girls on several occasions. T.M. described J.M. as "a very anti-social person" who was "never open to any advice from her family or medical professionals" regarding her wellbeing and mental health issues. T.M. had "witnessed [J.M.'s] physical and mental states worsen over the years." T.M. saw N.M. experiencing what T.M. had experienced as a child living with J.M.— "having to worry about where my sisters and I would have to sleep every night" and being "forced to take on a motherly role and assist with the feeding and caring of my younger siblings at a very young age." T.M. had observed that N.M.'s and A.L.'s mental

14

and physical states had "greatly improved" since they were detained from J.M. The girls appeared "more happy and outgoing" instead of "sad and withdrawn." According to T.M., the girls were now being allowed contact with family members, which is something J.M. had prohibited.

The juvenile court (Judge Amy Pellman) held the adjudication hearing on September 5, 2012. The court granted DCFS's motion to dismiss the medical neglect allegations in the petition (counts b-2 & j-2). J.M. appeared at the hearing and testified. J.M. denied she experienced housing instability when N.M. and A.L. lived with her, but admitted she had moved with the children several times. She stated that she had been living alone in a studio apartment in Monrovia for the past seven months, and her ex-husband helped her pay the rent. She believed she was prepared to have the children live with her. She had beds for them. She was applying for Social Security Income (SSI). The clinic where she received treatment for her mental health issues was assisting her in filling out the SSI paperwork. She was physically disabled because of a disease in her back. She was applying for jobs at department stores and other places. She had not yet been called for any job interviews. If she found a job, she planned to have her daughter L.M. take care of the children while she worked. When her counsel reminded her that the court would not allow L.M. to care for the children, J.M. stated that she would have to place them in daycare. She had not yet investigated daycare options for the children.

Regarding her mental health issues, J.M. stated she did not believe her "correct diagnosis" was Bipolar Disorder. She believed her correct diagnoses were anxiety, depression and a mood disorder. Dr. Pinson, the psychiatrist she had been seeing for seven years, diagnosed her. During the past eight months, she had been seeing Dr. Pinson once a month. She had not missed an appointment during that time. Her current prescriptions were Cymbalta, "Tropomate" [sic] and Ativan to be taken once a day. She denied changing her medication in the past year or experiencing side effects from her medication.

On cross-examination, J.M. denied (1) that she ever slept in a garage with the children, (2) that E.R. slept in a car seat when she moved to the motel, (3) that she was

15

evicted from a house, (4) that she was offered $2,500 in public housing assistance, (5) that she stopped taking her medication during the past year, and (6) that she had arranged for a different therapist. J.M. stated that when N.M. and A.L. lived with her at her parents' home they slept in a bedroom in the house.

J.M.'s counsel argued the juvenile court should dismiss the petition based on insufficiency of the evidence. DCFS's counsel and the children's counsel urged the court to sustain the allegations in the petition.

The juvenile court sustained the remaining allegations in the petition, quoted above, regarding J.M.'s mental and emotional problems (count b-1) and inability to meet the requirements under ASFA for placement of E.R. (count b-3).

**Disposition**

Also at the September 5, 2012 hearing, the juvenile court declared N.M. and A.L. dependents of the court and removed them from J.M. The court ordered reunification services for J.M., but stated it wanted an Evidence Code section 730 psychological evaluation completed before it decided what services to order. The court granted J.M. monitored visitation with the children.[4] The court denied DCFS's section 388 petition seeking to revoke J.M.'s legal guardianship over N.M. and A.L.

In an October 31, 2012 status review report, DCFS stated J.M. had not contacted DCFS to inquire about visitation or the welfare of the children. DCFS attempted to contact J.M., but had not heard back from her.

On January 28, 2013, a fellow in forensic psychology at the USC Institute of Psychiatry and Law, issued his report after conducting an Evidence Code section 730 evaluation of J.M. on November 28, 2012. The evaluator concluded that J.M. met the "criteria for Bipolar Disorder Not Otherwise Specified, Panic Disorder, and an Anxiety Disorder Not Otherwise Specified." The evaluator stated: "There is evidence of ongoing

---

[4] At the September 5, 2012 hearing, the juvenile court also adjudicated the separate petition involving one-year-old E.R. and made disposition orders as to E.R., but we do not discuss those orders because this appeal does not pertain to E.R.

16

paranoia regarding DCFS and people in the community, however, she does not appear to be suffering from a primary psychotic disorder. Her mental health symptoms are most likely contributing to her impaired judgment, poor distress tolerance and lack of financial and housing stability, all which interfere with her ability to safely parent her grandchildren." The evaluator opined that the children should remain in their current placement and the juvenile court should consider reunification services in the future after treatment goals have been met. The evaluator believed supervised visitation "with close monitoring" was appropriate.

As stated in the report, during the evaluation, J.M. stated she did not learn anything from her parenting class because she already "'knew everything.'" In her stress management class, however, she learned "how to stay grounded, focused and how to heal."

Regarding J.M.'s current symptoms, the evaluator reported: "Currently, [J.M.] endorsed symptoms that include nightmares from traumatic physical abuse, feeling anxious, and panic attacks, especially when dealing with the courts or DCFS. In fact, she stated during some of her visits, she will leave in the middle of the visit from feeling anxious and overwhelmed. She endorsed that since she has been taking her medication, she still feels anxious but it has not gotten to the point where she gets a panic attack. Off medications, she reports feeling tired, sad and has panic attacks, including symptoms of increased heart rate and sweaty palms. She also has evidence of paranoia, as shown in her beliefs that DCFS was trying to trick her into taking her kids when they offered her homeless assistance, and in her beliefs that others could not be trusted."

During the evaluation, J.M. became anxious at times. She commented that the "evaluator's shirt and tie [were] making her anxious." She also had "sudden shifts in mood," alternating between laughing and crying. The evaluator opined that J.M. had difficulty regulating her emotions when she was overwhelmed.

In discussing J.M.'s relationship with her grandchildren, the evaluator reported: "[J.M.] reported her grandchildren made her feel, 'loved, I had someone in my life that cared about me.' 'It took the sadness away and made me feel stronger, happier.' 'When

17

I try to visit them they blame me. They make up excuses not to see us.' She believes that the children denying them their visits are a result of them being manipulated by others. She stated that since the grandchildren have been removed they are withdrawn and distraught."

At the March 6, 2013 continued disposition hearing, DCFS recommended no reunification services for J.M., and the children's counsel joined in that recommendation. The juvenile court (Referee Albert Garcia) ordered N.M. and A.L. removed from J.M.'s custody and declined to order reunification services for J.M. J.M.'s counsel objected to the order. As to N.M. and A.L., the court set a review of permanent plan hearing. As to E.R., the court set a section 366.26 selection and implementation hearing.

On March 11, 2013, J.M. filed a notice of intent to file writ petition regarding the March 6, 2013 orders as to N.M. The trial court processed the notice of intent as a notice of appeal.

J.M. asks this court to treat her notice of intent to file a writ petition as a notice of appeal from the final disposition order, as to both N.M. and A.L. As set forth in DCFS's motion to take judicial notice of post-judgment evidence on appeal, on May 10, 2013, the juvenile court (Judge D. Zeke Zeidler) held a rehearing on contested disposition and issued a final disposition order removing N.M. and A.L. from J.M.'s care and awarding J.M. reunification services to include the treatment and services recommendations set forth in the evaluator's January 28, 2013 report. We grant DCFS's motion for judicial notice of the May 10, 2013 minute order. We treat J.M.'s notice of intent as a notice of appeal from the May 10, 2013 final disposition order, as to both N.M. and A.L.

## DISCUSSION

### Jurisdictional Findings

J.M. challenges the sufficiency of the evidence supporting the jurisdictional findings. DCFS concedes the allegation regarding J.M.'s inability to meet requirements under ASFA for placement of E.R. (count b-3), is not a proper basis for jurisdiction as to N.M. and A.L. in this case. Accordingly, we reverse that allegation and review the

18

sufficiency of the evidence supporting the allegation regarding J.M.'s mental and emotional problems (count b-1).

"""When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258-1259.)

Jurisdiction under section 300, subdivision (b), is appropriate where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).)

The sustained allegation regarding J.M.'s mental and emotional problems states: "The children N[.]M[.] and A[.]L[.]'s Legal Guardian, Maternal Grandmother, J[.][M[.], has mental and emotional problems, including a diagnosis of Bi-polar [sic] Disorder, which renders the Legal Guardian unable to provide regular care and supervision of the children. The Legal Guardian failed to take the Legal Guardian's psychotropic medication as prescribed. Such mental and emotional condition on the part of the Legal Guardian endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of physical harm and damage."

19

DCFS "had the 'burden of showing specifically how the minors have been or will be harmed and harm may not be presumed from the mere fact of mental illness of a parent.' [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 136.) "Although evidence of past conduct may be probative of current conditions," where a child has not suffered serious physical harm or illness, "the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*Id.* at pp. 135-136.)

Substantial evidence in the record demonstrates, at the time of the jurisdiction hearing, J.M. was being treated for mental illness. During the pendency of these proceedings, her diagnoses included Bipolar disorder and mood disorder with anxiety and panic. J.M. had had periods of time when she stopped taking her medications, as J.M.'s daughter T.M. and the clinic where J.M. received her treatment had informed DCFS. According to clinic staff, J.M. had experienced side effects from some of the medications and needed to stop taking them and switch to other medications.

Throughout these proceedings, J.M. exhibited erratic behavior. She threatened landlords and DCFS staff, expressed paranoia that everyone was against her, made unfounded allegations about marks on the children, clung to A.L. during visits in an inappropriate manner, told the children not to listen to their caretakers, etc.

J.M. argues DCFS relied on old evidence and cannot demonstrate J.M.'s mental and emotional problems posed a substantial risk of harm to the children at the time of the adjudication hearing. We disagree. J.M.'s testimony at the hearing indicates J.M. was not yet at a point in her treatment where she could acknowledge how her mental and emotional problems and her behavior affected the children. During her testimony, she attempted to rewrite history to conform to her distorted view of the manner in which she had parented the children. She denied that she and the children had stayed in the unheated garage of her parents' home. She asserted that the children had always slept in bedrooms inside the house while living at her parents' home. She denied that E.R. had

20

slept in her car seat while living at the motel. She denied that she had experienced housing instability while the children lived with her. She denied changing her medication in the past year or experiencing side effects from her medication, despite her psychiatrist's statements to the contrary.

Moreover, the section 730 psychological evaluation, conducted nearly three months after the adjudication hearing, demonstrates J.M.'s mental and emotional conditions had not yet stabilized to the point where she could effectively parent the children. The evaluator concluded J.M. met the criteria for Bipolar disorder, panic disorder and anxiety disorder. The evaluator stated that J.M.'s anxiety was evident during the evaluation and she experienced sudden mood shifts, alternating between laughing and crying. J.M. continued to express paranoia about DCFS and others being against her and turning the children against her. The evaluator opined that J.M.'s mental health issues contributed to her poor judgment and housing instability and interfered with her ability to safely parent the children.

The juvenile court did not err in sustaining the allegation regarding J.M.'s mental and emotional problems (count b-1). Substantial evidence in the record demonstrates that, at the time of the adjudication hearing, there was a substantial risk N.M. and A.L. would suffer serious physical harm or illness as a result of J.M.'s mental and emotional problems.

**Removal Order**

J.M. also challenges the sufficiency of the evidence supporting the dispositional order removing N.M. and A.L. from her custody.

A juvenile court may take a dependent child from the physical custody of her legal guardian where "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).)

21

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.] [¶] Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child. [Citation.] [¶] Whether the conditions in the home present a risk of harm to the child is a factual issue. Again, we apply the substantial evidence test." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

The substantial evidence described in the preceding section of this opinion demonstrates that removal was necessary to protect N.M. and A.L. from J.M.'s erratic and inappropriate behavior arising from her mental and emotional problems. J.M. was not at a point in her treatment where she could safely parent the children. J.M. repeatedly stated she needed the children in her custody to stabilize her own life. But it was the juvenile court's task to determine whether the children's welfare required removal from N.M.—it did. The removal order was not in error.

**DISPOSITION**

The jurisdictional finding regarding J.M.'s inability to meet requirements under ASFA for placement of E.R. (count b-3) is reversed. The jurisdictional finding regarding J.M.'s mental and emotional problems (count b-1) is affirmed. The May 10, 2013 final disposition order is affirmed.

NOT TO BE PUBLISHED.

                                                            CHANEY, J.


We concur:


        ROTHSCHILD, Acting P. J.


        JOHNSON, J.